*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* KHAMMO, Minors.

UNPUBLISHED
September 28, 2023

Nos. 364394; 364395[1]
Macomb Circuit Court
Family Division
LC Nos. 2021-000132-NA;
2021-000133-NA;
2021-000134-NA

Before: GADOLA, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Respondents appeal as of right the trial court's order terminating their parental rights to the minor children, JJK, JAK, and JUK, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. FACTUAL BACKGROUND

On June 3, 2021, the Department of Health and Human Services (DHHS) filed a petition requesting the trial court to take jurisdiction over JJK, JAK, and JUK. The petition first detailed that the minor children were previously removed from respondents' care in 2017 due to homelessness, improper supervision, and substance use, but returned to respondents in 2019 with wraparound[2] services. The petition alleged that (1) Child Protective Services (CPS) substantiated

---

[1] On January 11, 2023, this Court entered an order consolidating these two appeals. *In re Khammo Minors*, unpublished order of the Court of Appeals, entered January 11, 2023 (Docket Nos. 364394 and 364395).

[2] "Wraparound is an individualized, holistic, comprehensive, youth-guided, and family-driven planning process. This voluntary process utilizes a collaborative team approach including youth and their family and their choice of professional and natural supports." Michigan Department of Health and Human Services, *Wraparound Services* <https://www.michigan.gov/mdhhs/keep-mi-

a complaint concerning JAK and JUK breaking into a semitruck in an apartment complex on March 21, 2021, (2) respondents disclosed to CPS on March 24, 2021 that the family was in the process of getting evicted from their residence due to destruction of property, and (3) respondent-mother disclosed that JAK was previously diagnosed with autism, but respondents failed to seek any services or an individualized education program (IEP) for JAK. In addition, respondents were removed from their residence on May 4, 2021 by Macomb County Sheriffs. They failed to pack their belongings or prepare a safe place to take the minor children and they refused to use the numerous housing resources provided by the DHHS, CPS, or the Families Together Building Solutions (FTBS) program.

The petition further alleged that (1) since the termination of wraparound services, the minor children's behavior had spiraled out of control, with multiple police reports detailing allegations of destruction of property by JJK, JAK, and JUK; (2) respondents reported that their current income was $900 per month, which made it difficult to afford their current housing; (3) JJK, JAK, and JUK failed to attend school on a consistent basis; and (4) JAK's teacher reported that the minor children were frequently late to school. The petition additionally alleged that CPS received numerous new allegations concerning respondents and the minor children, which included (1) on May 26, 2021, law enforcement contacted respondents to pick up JJK, JAK, and JUK after the children were observed running around in a parking lot and JUK informed the officers to "just shoot him," and (2) on May 27, 2021, when CPS interviewed the minor children regarding the parking lot incident, JJK and JUK admitted that they attempted to run away from the officers, and respondents were aware of the whereabouts of JJK, JAK, and JUK. The petition further noted that on June 1, 2021, CPS received an additional complaint concerning JJK, JAK, and JUK which claimed the minor children set their neighbor's trash on fire. After law enforcement arrived at the scene, JJK, JAK, and JUK taunted the officers and proceeded to throw rocks at the neighbors and police, but respondents made no attempts to stop the minor children's behavior.

Following a preliminary hearing, the trial court authorized the petition, removed the minor children from respondents' care, and ordered respondents to complete the recommended DHHS programs. On June 9, 2021, the DHHS filed an amended petition detailing new allegations against respondents. The petition alleged that CPS contacted JUK's therapist on June 9, 2021, who noted concerns regarding potential substance use by respondents based on their behavior. Respondent-mother further admitted to CPS that both respondents suffered from an addiction to prescription pills in the past, and respondent-mother was currently prescribed Suboxone[3]. The amended petition was authorized on June 16, 2021.

On June 24, 2022, Ross Vultaggio, a foster care worker, filed a permanent custody petition to terminate respondents' parental rights to JJK, JAK, and JUK under MCL 712A.19b(3)(c)(*i*),

---

healthy/mentalhealth/mentalhealth/childrenandfamilies/eb-pp-offered/wraparound>  (accessed July 13, 2023).

[3] Suboxone, a "combination medication containing buprenorphine and naloxone, is one of the main medications used to treat opioid addiction." Harvard Health Publishing, *5 Myths About Using Suboxone to Treat Opiate Addiction* <https://www.health.harvard.edu/blog/5-myths-about-using-suboxone-to-treat-opiate-addiction-2018032014496> (accessed July 17, 2023).

(c)(*ii*) (other conditions implicating the court's jurisdiction exist and have not been rectified), (g), and (j). The petition alleged that (1) respondent-father failed to participate in any substance use treatment following the completion of his Screening, Assessment and Support Services (SASS) assessment from October 25, 2021 to May 4, 2022, (2) respondent-father tested positive for amphetamines, buprenorphine, and norbuprenorphine in May 2022, and missed two drug screenings in April 2022, and (3) respondent-father completed parenting classes on April 7, 2022, but he did not demonstrate any progress as he continuously neglected to provide structure, rules, and consequences for the minor children during supervised parenting time. The petition further purported that respondent-father completed an Alternatives to Domestic Aggression (ADA) assessment on August 11, 2021, which revealed respondent-father's attempts to absolve himself of responsibility for his children's behavior resulted from his chronic mental health issues, long-time dependence on Suboxone, and past alcohol use. Furthermore, respondents were suspects in a retail fraud and stolen vehicle investigation on May 5, 2022, and respondent-mother contacted the Sterling Heights Police Department on May 8, 2022 because respondent-father was "hurting her," and respondent-father resisted arrest for domestic violence.

The permanent custody petition further purported that respondent-mother completed her SASS assessment on August 5, 2021, tested positive for amphetamines, buprenorphine, norbuprenorphine, and tetrahydrocannabinol (THC) in May 2022, missed two drug screenings in April 2022, and failed to participate in substance use treatment from September 27, 2021 to April, 28, 2022. Respondent-mother additionally completed an ADA assessment on August 11, 2021, which revealed that her dependence on Suboxone, as a substitute for narcotics, negatively contributed to the family dynamics and inability to recognize her role in the conditions leading to the removal of JJK, JAK, and JUK. The petition detailed that respondent-mother reported feeling unsafe around respondent-father, no longer wanted to reside with respondent-father, and intended to obtain a divorce; however, respondent-mother was reliant on respondent-father for financial support. Respondent-mother completed parenting classes on July 26, 2021, however, she still struggled with creating structure, redirecting, and discipling JJK, JAK, and JUK. The petition also alleged that respondents were residing in appropriate housing, however, the monthly rent of $1,500 appeared beyond their financial means because respondent-father only received $1,000 per month in Social Security income and respondent-mother was unemployed. While respondent-father reported earning $800 per month in additional income from a side job, he did not provide proof of employment to the DHHS.

Following the September 16, 2022 and November 4, 2022 evidentiary hearings, the trial court determined that petitioner presented clear and convincing evidence to support termination of respondents' parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). The trial court further opined that petitioner failed to meet its burden under MCL 712A.19b(3)(c)(*ii*) because there was no evidence presented under this statutory ground. The trial court also determined that petitioner established, by a preponderance of the evidence, that termination of respondents' parental rights was in the best interests of JJK, JAK, and JUK.

## II. STATUTORY GROUNDS

Respondents argue that the trial court clearly erred when it determined that the DHHS presented clear and convincing evidence to support termination of their parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). We agree that petitioner did not meet its evidentiary burden under

MCL 712A.19b(3)(g) as to both respondents; however, we disagree concerning MCL 712A.19b(3)(c)(*i*) and (j).

"To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). This Court reviews a trial court's factual findings and ultimate determinations on the statutory grounds for termination for clear error. *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

### A. MCL 712A.19b(3)(c)(*i*)

There are grounds for termination under MCL 712A.19b(3)(c)(*i*) if "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." *In re White*, 303 Mich App at 710, citing MCL 712A.19b(3)(c)(*i*). Moreover, if the parent is a respondent in a proceeding under this chapter, "182 or more days [must] have elapsed since the issuance of an initial dispositional order." *In re Atchley*, 341 Mich App 332, 343; 990 NW2d 685 (2022), citing MCL 712A.19b(3)(c)(*i*). A parent's failure to resolve issues pertaining to substance use, or a parent's continued inability to provide adequate housing and financial support for a minor child, constitutes clear and convincing evidence that termination is appropriate under the cited statutory ground. *In re Frey*, 297 Mich App 242, 244; 824 NW2d 569 (2012). A parent's repeated positive or missed drug screenings, and lack of engagement with substance use counseling services, may demonstrate that termination of parental rights is warranted under MCL 712A.19b(3)(c)(*i*). *In re Atchley*, 341 Mich App at 345.

It is undisputed that more than 182 days have elapsed between the initial dispositional order issued on July 26, 2021, and the order terminating respondents' parental rights on November 28, 2022. Therefore, the fundamental issue is whether the conditions that led to adjudication continued to exist and, if so, whether there was a reasonable likelihood they would be rectified within a reasonable time considering the young children's ages. We conclude that the trial court did not clearly err when it found clear and convincing evidence that the conditions that led to adjudication continued to exist, and there was no reasonable likelihood they would be rectified within a reasonable time considering the ages of JJK, JAK, and JUK.

Respondents' substance use, inadequate housing, lack of employment, mental health concerns, neglect, and improper supervision of the minor children led to the initial adjudication. Petitioner presented detailed testimony concerning respondents' continued substance use, drug screening inconsistencies, and repeated refusal to participate in treatment services during the September 16, 2022 and November 4, 2022 evidentiary hearings. Vultaggio expressed concerns regarding respondents' use of prescribed substances due to the high and fluctuating levels of buprenorphine and amphetamines reflected in various drug screenings, and respondents' failure to provide documentation regarding their use of Adderall to determine whether the amphetamines were within the appropriate therapeutic range. Vultaggio and other foster care workers further reported that respondent-father appeared under the influence during supervised parenting time, due

-4-

to respondent-father sweating and pacing. With regard to respondent-mother, Voltaggio testified that, while she completed six sessions of a substance use treatment program in May 2022, she subsequently failed to participate in further treatment despite continued concerns regarding respondent-mother's drug-seeking behavior to obtain Adderall.[4] Furthermore, respondents did not comply with the orders of Dr. Silverman following their psychiatric evaluations, which was to detox and be reevaluated.

Respondents were also obligated to participate in a variety of outpatient services, and while respondents did complete the requested SASS assessments, respondents did not comply with the recommendations enumerated in the evaluations—which included mental health, substance abuse, and psychological evaluation services—until after the filing of the permanent custody petition. Vultaggio testified that respondent-father attended an intake appointment for mental health and substance abuse services the week prior to the continued evidentiary hearing, and participated in three sessions with a licensed therapist at a community health center since September 2022. Respondent-mother completed an intake assessment for substance abuse and mental health services in September 2022, and participated in one or two therapy sessions since October 2022. Respondents, however, continued to miss or test positive during drug screenings. Respondent-father tested positive for amphetamines for the two drug screenings completed in September 2022, tested positive for buprenorphine in October 2022, and missed a drug screening on October 19, 2022. Vultaggio further detailed that respondent-mother missed a drug screening on September 20, 2022, and tested positive for amphetamines and buprenorphine on October 6, 2022. Unfortunately, while there was limited progress, the condition continues to exist and there is no reasonable likelihood that it will be rectified within a reasonable time, particularly given that substance use has plagued respondents since the previous child protective proceedings in 2017.

Respondents' housing instability, irregular employment, neglect, and inadequate parenting skills also led to the adjudication. The original petition detailed the significant behavioral issues and improper supervision of the children, which included (1) JAK and JUK breaking into a semitruck in an apartment complex in March 2021; (2) JJK, JAK, and JUK failing to attend school on a consistent basis, with the minor children missing more than half of the school year, both online and in person—JAK had 177 unexcused absences and JJK had 175 unexcused absences; and (3) JUK's suspension from school in May 2021 for inappropriate behavior, which included making comments such as "suck my d**k*," and "f**k me up the a**."

The petition also provided that (1) in May 2021, law enforcement contacted respondents to pick up JJK, JAK, and JUK after the children were observed running around in a parking lot, and JUK informed the officers to "just shoot him;" (2) CPS subsequently interviewed the minor children regarding the parking lot incident—JJK and JUK admitted that they attempted to run away from the officers and respondents were aware of the whereabouts of JJK, JAK, and JUK; and (3) in June 2021, CPS received an additional complaint concerning JJK, JAK, and JUK, which

---

[4] "Drug-seeking behavior is a commonly used, although poorly defined, term that describes a range of activities directed towards attainment of sought-after drugs." National Library of Medicine, *Dealing with Drug-Seeking Behavior* < https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4919169/> (accessed July 25, 2023).

claimed the minor children set their neighbor's trash on fire, and after law enforcement arrived at the scene, JJK, JAK, and JUK taunted the officers and proceeded to throw rocks at the neighbors and police, with no attempts from respondents to stop the minor children's behavior.

In light of the severity of the children's previous and continued behavioral issues, respondents failed to develop the necessary parenting skills to curb or address such conduct. While respondents completed the required parenting classes, supervised visitations remained chaotic because respondents were unable to set any structure during the sessions. See *In re Sanborn*, 337 Mich App 252, 274; 976 NW2d 44 (2021) (stating that even if a respondent has participated in all the services that the DHHS has offered, mere participation is not the same as overcoming the barriers justifying removal in the first place). Vultaggio shared that respondents generally did not plan any games or activities for the minor children; rather, interaction between respondents and JJK, JAK, and JUK was limited. There were additional concerns regarding respondents' abilities to discipline or redirect the children despite the inappropriate behavior of JJK, JAK, and JUK during supervised parenting time. Furthermore, regarding the incident during which JUK was Absent Without Legal Permission (AWOLP) from his placement, respondents lied when asked by Vultaggio regarding JUK's whereabouts, and the matter was only resolved after FBI agents entered respondents' residence, retrieved JUK, and proceeded to arrest respondents. Vultaggio expressed that while JUK was safe, "[o]bviously, he was very, very agitated. He was very confused. He was very angry and upset. When I got to the office the FBI officers had—they had to handcuff [JUK] to a seat belt because he kept on trying to jump out of the car." The aforementioned episode resulted in the suspension of respondents' parenting time, during which the minor children's behavior stabilized.

Respondents have continuously failed to address matters related to financial stability and housing. While respondents' current residence passed the DHHS home assessment, Vultaggio noted that there was a risk of eviction because the monthly rental price of $1,500 appeared excessive compared to respondents' alleged joint income of $1,800, and respondents failed to provide any documentation demonstrating that the rent or utilities were up to date. Respondents have had ample time to address the issues leading to the removal of JJK, JAK, and JUK, but approximately 17 months after the filing of the initial petition, respondents opted to continuously decline court-ordered treatment services. Extending reunification efforts at this point in time, after respondents already demonstrated that they are incapable of providing care and custody for their minor children, is not justifiable. Therefore, the trial court did not clearly err by finding that there was no reasonable likelihood that respondents will be able to rectify these conditions within a reasonable time given the ages of JJK, JAK, and JUK.

## B. MCL 712A.19b(3)(g)

To terminate parental rights under MCL 712A.19b(3)(g), the DHHS must demonstrate that "[t]he parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." *In re Pederson*, 331 Mich App 445, 473; 951 NW2d 704 (2020), citing MCL 712A.19b(3)(g) (quotation marks omitted).

We conclude that the trial court clearly erred in determining that the termination of respondents' parental rights was appropriate based upon MCL 712A.19b(3)(g) because the limited testimony presented by petitioner concerning respondents' financial status demonstrated that respondents were incapable of providing for JJK, JAK, and JUK. Vultaggio, throughout the entirety of the instant child protective proceedings, voiced his concerns regarding respondents' capacity to provide for themselves and their minor children, considering it was a single-income household, which primarily relied on Social Security income. Respondent-father asserted that he earned approximately $1,000 in Social Security income, and $600 to $800 from various odd jobs, whereas respondent-mother was unemployed. Vultaggio further expressed that respondent-father failed to provide any verification regarding any side employment, however, even if respondents' monthly joint income was $1,800, it seems unlikely that respondents were able to manage the rest of their expenses with the remaining $300 after paying the $1,500 monthly rent fee. While the referee asserted that there was no information in the evidentiary record concerning respondent-mother's ability to work, there was similarly no indication that respondent-mother was eligible for employment with a sufficient enough salary to cover the remainder of the household expenses.

The circumstances of the instant case are markedly different from other cases presented before this Court, when the trial court or referee made specific findings related to the respondent's potential to financially provide for the care and custody of their children. See *In re Pederson*, 331 Mich App at 474 (highlighting that the respondents were admittedly unable to work due to their mental health conditions, which restricted their income, and they owed tens of thousands of dollars in outstanding debts); see also *In re Richardson*, 329 Mich App 232, 250; 961 NW2d 499 (2019) (noting the referee considered the respondent-father's established hourly wages and the number of hours respondent-father worked per week, which amounted to 16 to 18 hours a day for six days a week, in addition to the amount of state benefits respondent-mother was receiving).

Although the termination of respondents' parental rights was not proper under MCL 712A.19b(3)(g), "if the trial court did not clearly err by finding one statutory ground existed, then that one ground is sufficient to affirm the termination of respondent's parental rights." *In re Sanborn*, 337 Mich App at 273. Having determined that termination was proper under subsections(3)(c)(*i*), and (3)(j), termination of respondents' parental rights remains appropriate.

## C. MCL 712A.19b(3)(j)

Under MCL 712A.19b(3)(j), a trial court may terminate parental rights if it finds by clear and convincing evidence that there " 'is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.' " *In re Pops*, 315 Mich App 590, 599; 890 NW2d 902 (2016), quoting MCL 712A.19b(3)(j). Termination is proper pursuant to MCL 712A.19b(3)(j) if there is a potential of physical or emotional harm to the children. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011).

The trial court did not clearly err in finding there was a reasonable likelihood that the children would be harmed if returned to respondents because of respondents' unlawful conduct, domestic violence allegations, the documented mental health concerns of JJK, JAK, and JUK, and respondents' general inability to adequately provide for the care and custody of the children. There were numerous concerns regarding respondents' criminal activity because various police reports

indicated that respondents attempted to shoplift or steal vacuums from a Kroger store, and further attempted to steal a television from a Meijer location. Respondent-father was also arrested in December 2021, for receiving and concealing a stolen motor vehicle. Vultaggio additionally testified during the continued evidentiary hearing that, on November 1, 2022, a warrant was issued against respondent-mother for retail fraud through the 41B District Court; however, Vultaggio was unsure whether it resulted from the previous incidents that occurred in May 2022 in the Meijer and Kroger stores. As of the November 4, 2022 hearing date, the bench warrant remained active, which concerned Vultaggio as it could implicate the children. Furthermore, respondents were detained by FBI agents following the discovery of JUK in their residence after he was discovered AWOLP from his placement. The aforementioned unlawful conduct was in direct violation of the terms of the case service plan, which dictated that respondents become law abiding citizens and resolve any and all outstanding legal matters.

During the September 16, 2022 evidentiary hearing, Vultaggio expressed that there were ongoing apprehensions regarding domestic violence between respondent-father and respondent-mother, as respondent-mother contacted foster care workers on numerous occasions to discuss feeling unsafe with respondent-father. Moreover, in May 2022, officers were dispatched to respondents' home after respondent-mother called 911, respondent-mother locked herself in one of the backrooms in the residence, and respondent-father was subsequently arrested for domestic violence—after resisting arrest and requiring the assistance of three officers to detain him. Vultaggio additionally shared that respondent-father continued to maintain contact with respondent-mother, which was a violation of the issued PPO, and respondent-father violated the terms of his probation in October 2022. While respondent-father completed an ADA assessment on August 11, 2021, the subsequent report revealed respondent-father's attempts to absolve himself of responsibility for his children's behavior, which resulted from his chronic mental health issues, long-time dependence on Suboxone, and past alcohol use. Respondent-mother additionally completed an ADA assessment on August 11, 2021, which revealed her dependence on Suboxone, as a substitute for narcotics, negatively contributed to the family dynamics, and an inability to recognize her role in the conditions leading to the removal of JJK, JAK, and JUK.

Respondents are incapable of addressing the children's various mental health needs, as respondents themselves repeatedly failed to acquire treatment and develop the critical parenting skills to provide structure for JJK, JUK, and JAK. Vultaggio testified that JUK was diagnosed with adjustment disorder, attention-deficit/hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), and post-traumatic stress disorder (PTSD), and was receiving psychiatric services through his Qualified Residential Treatment Program (QRTP). JJK was diagnosed with PTSD and was receiving therapy. JAK was diagnosed with ADHD and reactive attachment disorder, and was participating in psychiatric and therapeutic services. The original petition detailed the minor children's excessive absences from school, and provided that JJK, JAK, and JUK were frequently late to school, and did not arrive on campus before lunch. Furthermore, respondents failed to acquire an IEP for JAK, when it was suspected that he may have autism. If respondents were previously unable to confirm the fundamental attendance of their minor children at school, or address the numerous behavioral issues previously detailed, it is unlikely that respondents would ensure JJK, JAK, and JUK were able to obtain the necessary psychological and psychiatric care for their wellbeing, and provide the structure necessary for the children to thrive.

The referee appropriately determined during the entry of opinion hearing:

. . . [T]here is absolutely no doubt if the children returned to the parents, they would be at risk of witnessing domestic violence, being homeless, not having their needs, either educationally or their mental health needs met, and would be unsupervised and unstable. The Court is convinced that a re-removal would be imminent.

The referee believed that the DHHS may have provided additional services to respondents, however, the agency made reasonable efforts towards reunification given its referrals for every aspect of the case service plan. Furthermore, respondents' counsels failed to raise any issues regarding any language barriers, inadequate DHHS services, or the need for statutorily mandated services per the Americans with Disabilities Act, 42 USC 12101 *et seq*.

Extending reunification efforts and granting respondents more time to acquire what is needed to parent sufficiently, and reduce the risk of emotional harm to their children, cannot be justified at this point. Respondents were granted an opportunity to remedy the conditions that presented a risk of harm to JJK, JAK, and JUK, and their inability to do so has placed, and will continue to place, their children at risk of further trauma. Therefore, the trial court did not clearly err in finding there is a reasonable likelihood, based on the conduct or capacity of respondents, that JJK, JAK, and JUK will be harmed if returned to respondents.

## III. BEST INTERESTS

Respondents argue that the trial court clearly erred when it determined that termination of respondents' parental rights was in the best interests of JJK, JAK, and JUK under MCL 712A.19b(5). We disagree as to both respondents.

"Even if the trial court finds that the Department has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children." *In re Gonzales/Martinez*, 310 Mich App 426, 434; 871 NW2d 868 (2015). This Court reviews a trial court's best-interests determination for clear error. *In re Sanborn*, 337 Mich App at 276. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App at 296-297.

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). In making its determination, the trial court "should weigh all the evidence available to it," and may consider

the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. Other considerations include the length of time the child was in care, the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all, and compliance with the case service plan. [*In re Atchley*, 341 Mich App at 346-347, quoting *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 63; 874 NW2d 205 (2015) (quotation marks and citation omitted).]

In the majority of cases, it is in the child's best interests to be placed with his or her siblings. *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012).

The trial court did not clearly err when it determined that termination of respondents' parental rights was in the best interests of JJK, JAK, and JUK under MCL 712A.19b(5). Petitioner presented detailed testimony regarding respondents' repeated failures to abide by a case service plan, unresolved mental health issues, financial instability, unlawful conduct, domestic violence allegations, and a general lack of parenting ability. During the previous initiation of child protective proceedings between 2017 and 2019, respondents were offered extensive services by the DHHS, which included parenting classes, individual therapy, domestic violence counseling, mental health services, psychological and psychiatric evaluations, supportive visitations, and a parent-partner, but respondents failed to apply any learned skills or make any substantial progress throughout the instant case.

Respondents advance that the United States Supreme Court has clearly determined the fundamental liberty interest of natural parents in the care, custody, and management of their children does not evaporate simply because they have not been model parents or have lost temporary custody of their children. However, this Court must acknowledge that "[a] parent's right to control the custody and care of her children is not absolute, as the state has a legitimate interest in protecting the moral, emotional, mental, and physical welfare of the minor and in some circumstances neglectful parents may be separated from their children." *In re Richardson*, 329 Mich App at 251 (quotation marks and citation omitted). Furthermore, "at the best-interest stage, the child's interest in a normal family home is superior to any interest the parent has." *In re Moss*, 301 Mich App at 89. As the referee appropriately determined at the entry of opinion hearing:

> This is a very difficult case as the parents have been visiting the children regularly and there is a bond. However, it is also clear that the parents are a source of chaos in the children's lives. The parents do not [] recognize the emotional and educational needs of the children.
>
> * * *
>
> Additionally, the parents did not testify in this case. The Court would've liked to hear them say that they wanted their kids, they love their kids, what their plan was for a reunification. While the PPO is disputed, what is undisputed is there's been domestic violence after the domestic violence assessment and services being offered. [This] Court does not believe the parents possess the ability or desire to do what they have to do in order to be reunited with the children.

The referee further noted that JJK, JAK, and JUK were in dire need of stability, due to their previous removal and numerous placements, and "[n]early half their young lives ha[ve] been spent in and out of foster homes, residential facilities, and hospitals. Fortunately, the children now have hope for being in a stable home."

While respondents argue that the trial court did not adequately consider alternative placement options, the referee explicitly stated that she did not believe guardianships were appropriate because no relatives were identified as potential placements, respondents remained

noncompliant with the case service plan, and the DHHS was active in its pursuit of a Chaldean family capable of adopting JJK, JAK, and JUK, to best maintain the children's religious and cultural identities. The referee further noted that all of the foster care workers and the lawyer-guardian ad litem asserted that the termination of respondents' parental rights would be in the minor children's best interests.

JJK, JAK, and JUK are thriving in their current placements, and despite living separately, their respective foster parents and the QRTP have made efforts to allow the children to meet on a consistent basis, which is critical given the children's extensive placement history. Vultaggio noted that JUK was in nine distinct placements, and JJK and JAK were in three different placements, throughout the initial removal proceedings between 2017 and 2019, before returning to respondents' care and custody. During the pendency of the instant case, JUK was in 12 or 13 different placements, JAK was in seven distinct placements, and JJK was in two different placements. While the current placements of the minor children were hesitant about adoption, the DHHS and JJK's foster family were active in their pursuits of "locating a Chaldean family who can adopt the children together or at least find long-term placement so that they can maintain their religious and cultural heritages."

Continued reunification efforts, at this point in time, are outweighed by the minor children's need for stability, permanency, and finality. As the referee expressed, respondents have "been on a parent agency [plan] for 15 months. It wasn't until the termination petition was in the midst of trial that they began the services required. The supplemental petition was filed several months prior to trial, and yet they waited until the month before to start their services." Therefore, the trial court did not clearly err by finding that termination of respondent's parental rights was in the best interests of JJK, JAK, and JUK.

Affirmed.

/s/ Michael F. Gadola
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly